UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CIVIL ACTION NOS. 08-0515; 08-4068; 08-4070; and 08-4071

KONINKLIJKE PHILIPS ELECTRONICS N.V.
and
U.S. PHILIPS CORPORATION

v.

CINRAM INTERNATIONAL, INC., ET AL.; THE ADS GROUP, ET AL.;
ENTERTAINMENT DISTRIBUTION COMPANY (USA), LLC, ET AL.; and
OPTICAL EXPERTS MANUFACTURING INC, ET AL.

MEMORANDUM AND ORDER
ON ALL DISPOSITIVE MOTIONS

August 23, 2012

STEARNS, D.J.

The patent in suit, U.S. Patent No. 5,068,846 ('846 Patent), entitled "Reflective, Optical Record Carrier," was issued to Pieter Kramer, the former head of the optical research group at plaintiff Koninklijke Philips Electronics N.V., on November 26, 1991.[1]  The '846 Patent is directed to a record carrier for video and/or audio information.  Presently before the court are the parties' various motions for summary judgment.  The court held a hearing on these motions in the Southern District of New

---

[1] The '846 Patent issued after almost twenty years of continuation applications (the initial patent application was filed in 1972).

York on January 27, 2012.[2]

## BACKGROUND[3]

The '846 Patent[4] discloses an optical storage disc consisting of three main structures. The lower surface of the disc is a substrate (also referred to as the "carrier substrate"), which permits the interpenetration or passage of a beam of light. The optical structure is comprised of a number of circular tracks in which data is stored in a pattern of pits and depressions.[5] A protective layer, also called an "additional layer," is located above the optical structure. The disc described in the '846 Patent is read in reflection mode, as opposed to transmission mode. In reflection mode, a beam of

---

[2] On June 25, 2012, Cinram International, Inc., filed for bankruptcy. For the nearly four years that this case has been assigned to me, Cinram has acted as the lead defendant on the assumption that issues resolved in favor of, or adversely to, Cinram would be largely conclusive of the interests of its allied co-defendants. As this opinion had been drafted prior to the notice of bankruptcy, Cinram figures heavily in the analysis. Although the opinion refers to the defendants collectively as including Cinram, the court and the parties understand that jurisdiction is now vested in the Bankruptcy Court and that this opinion is not binding on that Court.

[3] This Background is distilled from the court's *Markman* decision. *See Koninklijke Philips Elec.s N.V. v. Cinram Int'l, Inc.*, 709 F. Supp. 2d 259 (S.D.N.Y. 2010).

[4] The '846 Patent expired on November 26, 2008.

[5] The optical structure is also referred to as the "information structure." In addition, the pattern is sometimes referred to as the "crenulated" or "crenellated" surface.

radiation (referred to as the "read beam") passes through the carrier substrate and is reflected at the optical structure. During the disc's rotation, the read beam is focused on a fixed point on the optical structure and is modulated in accordance with the sequence of depressions on the track. The read beam passes through a half-silvered mirror, which serves as the reflector. The modulated beam is then intercepted by a radiation-sensitive detector. An electric signal is produced by the detector that corresponds to the information stored in the tracks. A connected electronic means is used to convert the signal into picture and sound. *See* '846 Patent, Col. 3, 1. 61 - Col. 4, 1. 10.[6]

At the heart of the dispute is Claim 1, which recites "[a] record carrier containing information which is readable by a beam of radiation, said record carrier comprising a disc-shaped, radiation-transmitting substrate having a pair of planar surfaces on opposite sides thereof, a *non-transmissive, radiation reflecting optical structure* on one of said planar surfaces of said substrate . . . ." *Id.* at Col. 5, 11. 61-66 (emphasis added).[7] The court construed the term "non-transmissive" to mean "an

_____

[6] In transmission mode, the read beam passes through the surface of the carrier substrate and emerges from the carrier to be captured by a detector on the converse side of the disc. The beam is modulated by the optical structure during its passage through the carrier substrate.

[7] The term "non-transmissive" is also found in Claims 6 and 7.

optical structure that reduces the transmission of radiant light to the greatest degree practicable consistent with the intended purpose." *Koninklijke Philips*, 709 F. Supp. 2d at 268.[8]

After a series of rejections, the '846 Patent was issued in 1991. Over time, Philips licensed the '846 Patent to Cinram and the other defendants, who are in the business of manufacturing (also called replicating) pre-recorded optical discs, including audio CDs. In 2005, Cinram and the other defendants ceased paying royalties to Philips. On January 18, 2008, Philips filed suit against defendants. Count I of the Second Amended Complaint alleges breach of contract and seeks payment of royalties allegedly owed to Philips under the License Agreement. Count II alleges patent infringement and seeks remedies for patent infringement, pursuant to 35 U.S.C. § 271, based on alleged use of the '846 Patent.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of

---

[8] Whether the "intended purpose" of the non-transmissive claim was to enable the reading of the disc in reflection mode, as Philips argues, or to work around the "Sony solution," as defendants contend, or was simply a nonsensical term invented to appease the Patent Examiner, are factual determinations for the jury to make. *Id.*

establishing that there is no genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## I. Infringement

On June 5, 2009, Cinram International, Inc., and Cinram Manufacturing, Inc. (collectively, Cinram), moved to dismiss as moot Count II of the First Amended Complaint, which asserts a claim for infringement of the '846 Patent.  This court denied the motion, noting that the court's March 26, 2009 Order "explicitly acknowledged plaintiffs' infringement claim."  Mar. 5, 2010 Order at 2.  Now having reached the summary judgment phase, defendants renew their motion to dismiss Philips' claim for patent infringement.

In 2005, defendants notified Philips that they had re-engineered their manufacturing processes to work around the claims of the '846 Patent.  Relying on § 5.2 of the License Agreement, they also informed Philips that no further royalties would be paid on the '846 Patent.[9]  Section 5.2 of the Licensing Agreement states:

---

[9] Defendants contend that "[w]hether Cinram changed its manufacturing process, how the process was changed, and whether CDs made pursuant to the new process embody the invention of the '846 patent, are not material facts for purposes of this motion."  Defs.' Infringement Mem at 3 n.3.  The court does not see how this can be so.  These disputed facts are the crucial determinants of the viability of Philips' patent

> [f]or the avoidance of doubt, in the event that the manufacture by Licensee of CD-Discs within the Territory would not infringe any of the Licensed Patents, Licensee shall have no obligation to report and pay royalties with respect to CD-Discs manufactured within the Territory and which are sold for final use within the Territory or imported (directly by Licensee or by a third party) into a country where no Licensed Patents exist, for final use in such country.

Defendants argue that because Philips never terminated the License Agreements,[10] "the covenants not to sue for patent infringement appurtenant to the license agreements remain in effect, and Cinram and the other replicators cannot be infringers."  Defs.' Infringement Mem. at 2.

In support of this argument, defendants rely on *Luckett v. Delpark, Inc.*, 270 U.S. 496, 502 (1926) ("It is a general rule that a suit by a patentee for royalties under a license or assignment granted by him, or for any remedy in respect of a contract permitting use of the patent, is not a suit under the patent laws of the United States, and cannot be maintained in a federal court as such."), and *Dow Chem. Co. v. United States*, 226 F.3d 1334, 1348 (Fed. Cir. 2000) (restricting Dow to the pursuit of contract remedies for the period prior to the termination of the license agreement, and patent infringement remedies for the period after the termination).  Philips contends that

_____

infringement claim.

   [10] It is undisputed that Philips did not terminate the License Agreements presently at issue.  Second Am. Compl. ¶ 59.

*Luckett* is inapposite, as it involved the breach of an equitable contract claim at a time before courts of law and equity were merged.  Philips also maintains that *Dow* was concerned only with the method of calculating damages, and not with the validity of the underlying infringement claim.

On balance, I agree with Philips' argument that defendants' CDs were not in the literal sense "Licensed Products."  The License Agreement therefore does not protect them from patent infringement liability.  As Philips accurately portrays it, the Agreement "did not grant a blanket license under the '846 Patent"; rather, it is "structured in such a way that individual CD-Discs do not become 'Licensed Products' unless and until they are reported and fully paid,"  Pl.'s Opp'n (Dkt #417) at 2, 15. Philips' reading is consistent with the general "presumption in commercial contracts . . . that the parties [in devising an agreement] were trying to accomplish something rational." *Fishman v. LaSalle Nat'l Bank*, 247 F.3d 300, 302 (1st Cir. 2001).  *See also Krosnowski v. Krosnowski*, 22 N.J. 376, 387 (1956) ("The construction of a written instrument 'to be adopted is the one which appears to be in accord with justice and common sense and the probable intention of the parties. It is to be interpreted as a business transaction entered into by practical men to accomplish an honest and straightforward end.'"), quoting *Clark v. State St. Trust Co.*, 270 Mass. 140, 153 (1930) (interpreting agreements governed by New York contract law).

The License Agreement explicitly defines "Licensed Products" as CD-Discs "which are duly reported and on which the royalties due hereunder are paid in accordance with the provisions of this Agreement." Evans Dec1. (Dkt #419) - Ex. A (License Agreement) ¶ 1.22. As Philips argues, because defendants "did not report and fully pay for discs covered by the '846 Patent, so Philips is allowed to sue for patent infringement based on that particular patent and those particular CD-Discs, as opposed to having to terminate the entire licensing pool before being able to do so." *Id*. at 4.[11]

Defendants, for their part, contend that the Federal Circuit rejected Philips' argument in *Tessera, Inc. v. Int'l Trade Comm'n*, 646 F.3d 1357 (Fed. Cir. 2011). In *Tessera*, the Court held that a licensee's sale of licensed products before the licensee paid royalties to a patentee, which was permitted under the license, did not later become unauthorized when the licensee defaulted on the incurred royalty payment. 646 F.3d at 1369-1371. There is an important distinction, however, between this case and

---

[11] There is further support for this argument in the language of License Agreement ¶ 5.2 ("For the avoidance of doubt, Philips confirms that it shall not assert any of the Licensed Patents against Licensee, nor against any of Licensee's customers or subsequent buyers of CD-Discs manufactured and sold by Licensee, *prior to the day on which such CD-Discs are to be reported pursuant to the provisions of this Agreement*, nor, provided that such CD-Discs have been duly reported in accordance with the provisions of this Agreement, *prior to the day when payment of royalties in respect of CD-Discs manufactured and sold by Licensee is due in accordance with the provisions of this Agreement*.") (emphasis added).

*Tessera*.  The issue in *Tessera* was whether plaintiff's patent rights were exhausted with respect to the downstream customers of a defaulting licensee.  Here, in marked contrast, the licensor (Philips) is asserting patent infringement claims against the licensees themselves (defendants), not the licensees' customers.  *Tessera* explicitly acknowledged that in the present factual context, a licensor like Philips has a viable claim against a defaulting licensee.  *Id*. at 1370 ("Any subsequent non-payment of royalty obligations arising under the TCC Licenses would give rise to a dispute with Tessera's licensees, not with its licensees' customers.").

The final arrow in defendants' quiver is the undeniably correct (but non-dispositive argument) that "as a matter of law, Philips is entitled to seek damages based on an alleged breach of contract," but "it is not entitled to also seek damages for patent infringement."  Defs.' Infringement Mem. at 4.  The argument is not dispositive because should Philips ultimately elect to pursue  contract remedies (as the court anticipates),[12] a patent infringement analysis would still be required (as defendants acknowledge) to determine whether the disputed CDs qualify as Licensed Products

_____

[12] Philips states (somewhat ambiguously) that "[a]lthough it is Philips' position that Defendants are liable for both breach of contract and patent infringement, Philips seeks damages under only one theory per unlicensed disc, a proper option under the Federal Rules." Pl's Opp'n (Dkt #417) at 9 n.6.  The court will require that Philips make a clear election of its preferred remedy at least thirty (30) days prior to the date on which trial is scheduled to commence – November 5, 2012.

under the Agreements at issue. *Id*. at 8 n.7. Consequently, the court will deny defendants' motion for summary judgment on the patent infringement claim.

## II. Willful Infringement

Defendants also move for summary judgment on Philips' claim of willful infringement. Willful infringement has both an objective and a subjective component. "To establish willful infringement, 'a patentee must [first] show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent.'" *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1319 (Fed. Cir. 2010), quoting *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc). The Federal Circuit has more recently held that "the threshold objective prong of the willfulness standard enunciated in *Seagate* is a question of law based on underlying mixed questions of law and fact and is subject to de novo review." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1005 (Fed. Cir. 2012). "If *Seagate*'s objective prong is met, 'the patentee must also demonstrate that this objectively-defined risk . . . was either known or so obvious that it should have been known to the accused infringer.'" *Spine Solutions*, 620 F.3d at 1319, quoting *Seagate*,

497 F.3d at 1371.[13]

Defendants argue that Philips has failed to come forward with sufficient evidence to make a showing of either objective or subjective willfulness, and moreover, that their reasonable defenses preclude any ultimate finding of willful infringement. *See Spine Solutions*, 620 F.3d at 1319 (stating that the "'objective' prong of *Seagate* tends not to be met where an accused infringer relies on a reasonable defense to a charge of infringement."). By "reasonable defenses," defendants refer to their arguments on claim construction and to their challenge to the validity of the '846 Patent (in addition to their previously described defenses to the allegations of direct patent infringement).[14]

---

[13] Defendants suggest that the subjective prong of the *Seagate* test (as framed in that decision) may "be in doubt" in light of the Supreme Court's decision in *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011), which holds that "willful blindness . . . surpasses recklessness and negligence. Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id*. at 2070-2071. As Philips points out, the discussion in *Global-Tech*, as it relates to willful blindness and induced infringement under 35 U.S.C. § 271(b), does not apply to a claim for willful *direct* infringement.

[14] Defendants state that the fact that Philips sought reconsideration of this court's claim construction ruling suggests that defendants' position on the disputed issue of claim construction was not objectively unreasonable. (The court denied Philips' motion for reconsideration on June 3, 2010.) Philips contends that "whether or not defendants had 'reasonable positions on claim construction, noninfringement and invalidity' . . . are issues for the jury." Pl.'s Opp'n (Dkt #417) at 12.

Philips' factual response is summarized as follows in its Opposition.

There is ample evidence that Defendants' decision to stop paying royalties on CD-Discs was objectively unreasonable because they expressly agreed to allow an independent expert to determine whether it was possible to make CD-Discs without using the '846 patent. Then, after the expert determined it was impossible to do so, Defendants unilaterally and knowingly decided that he was wrong and stopped paying royalties.

Pl.'s Opp'n (Dkt #417) at 4.

On entering the License Agreements, Philips and defendants had agreed that Philips would commission "an independent patent expert" to review the patents listed in Annexes A1 through A8 of the License Agreements "in order to confirm the essentiality of such patents." License Agreement ¶ 1.23; Second Am. Compl. ¶ 24. The independent expert who was ultimately chosen determined that the '846 Patent "is essential for implementing discs and players" according to the "Standard Specifications." Hennessy Decl.- Ex. A at 1. Philips argues that defendants' decision to cease paying royalties was taken in defiance of the independent expert's opinion, creating the objective likelihood that the continued sale of CDs was understood by defendants to be infringing. It is significant, as Philips notes, that defendants have not presented any opinions of counsel supporting the decision to stop the royalty payments.[15] "Although an infringer's reliance on favorable advice of counsel, or

---

[15] The court had previously ordered defendants by June 22, 2011, to "make an election as to whether they intend to rely upon opinions of counsel as a defense to

conversely his failure to proffer any favorable advice, is not dispositive of the willfulness inquiry, it is *crucial* to the analysis." *Seagate*, 497 F.3d at 1369 (emphasis added).[16]  *Cf. Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1056 (Fed. Cir. 1994) ("Possession of a favorable opinion of counsel is not essential to avoid a willfulness determination; it is only one factor to be considered, albeit an important one.").[17]

Philips argues that because the parties dispute material facts relating to the reasons for defendants' decision to disregard the "essentiality" determination of the independent expert – whether the '846 Patent was integral to the fabrication of the

---

willful infringement . . . ."  June 8, 2011 Mem. & Order at 2 (Dkt #319).  None of the defendants chose to produce such an opinion.  Philips' App. ¶ 23.

[16] In *Seagate*, the Federal Circuit also held that "as a general proposition, . . . asserting the advice of counsel defense and disclosing opinions of opinion counsel do not constitute waiver of the attorney-client privilege for communications with trial counsel." *Id.* at 1374.

[17] *Seagate* did not specify whether an advice of counsel defense goes to the objective and/or the subjective component of willful infringement.  *Seagate* does state that "[t]he state of mind of the accused infringer is not relevant to [the] objective inquiry," 497 F.3d at 1371, suggesting that advice of counsel might not be a consideration in weighing the objective prong.  On the other hand, *Spine Solutions* states that an accused defendant's reliance on a reasonable defense to infringement is to be considered, 620 F.3d at 1319, suggesting that legal advice on a "reasonable" defense is weighed in  assessing the objective prong.  Because the issue here is the *absence* of such advice, it would seem that both prongs of the test are implicated – in the first instance, the lack of any reliance on counsel's assurance of noninfringement; in the second, the subjective decision of defendants to forego such an assurance.

CDs, whether the changes to defendants' manufacturing processes effectively avoided the '846 Patent, and whether defendants under-reported disc sales – summary judgment on the willfulness claim is inappropriate.  What is clear is that the allegation of willful infringement when considered in the light of defendants' defenses (principally, invalidity and noninfringement) raises a mixed question of law and fact.

Given this posture, the court is guided by the procedure mandated in similar cases where mixed questions of law and fact are presented, as for example, when a defense of qualified immunity is raised.  In those cases, the court submits special interrogatories to the jury on the disputes of fact, while reserving for itself the ultimate question of law.  *See Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir. 2012) ("Thus, '[w]hether a defendant officer's conduct was objectively reasonable is a mixed question of law and fact.' If there are unresolved factual issues which prevent an early disposition of the defense, the jury should decide these issues on special interrogatories."), quoting *Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990).  This approach was recently endorsed by the Federal Circuit in *Bard*, 682 F.3d at 1008. ("In considering the objective prong of *Seagate*, the judge may when the defense is a question of fact or a mixed question of law and fact allow the jury to determine the underlying facts relevant to the defense in the first instance, for example, the questions of anticipation or obviousness.  But . . . the ultimate legal question of whether a

reasonable person would have considered there to be a high likelihood of infringement of a valid patent should always be decided as a matter of law by the judge."). Consequently, I will deny the motion for summary judgment on the willful infringement claim, while reserving "the ultimate legal question of whether a reasonable person would have considered there to be a high likelihood of infringement of a valid patent." *See id.*

### III. Invalidity

Defendants next move for summary judgment on the contention that the asserted claims of the '846 Patent are invalid as indefinite under the requirements of 35 U.S.C. § 112 ¶ 2 ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998). "[A] patent is presumed valid, and at trial [the challenger] ha[s] the burden of proving facts by clear and convincing evidence showing that the patent is invalid." *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed. Cir. 1993).

Philips alleges that defendants have infringed Claims 1 through 5 of the '846 Patent. Claim 1 recites an optical storage disc that contains a "non-transmissive,

radiation reflecting optical structure." '846 Patent, Col. 5, 11. 61-66. The court has construed the term "non-transmissive" to mean "an optical structure that reduces the transmission of radiant light to the greatest degree practicable consistent with the intended purpose." *Koninklijke Philips*, 709 F. Supp. 2d at 268.

Defendants contend that the claim term "non-transmissive" is indefinite as a matter of law because its scope depends on a subjective rather than objective standard. In support of this argument, defendants rely on *Datamize LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005) (holding that the phrase "aesthetically pleasing" was indefinite, and stating that "[t]he scope of claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention."). Defendants point out that Philips' own experts acknowledge that the meaning of the phrase "non-transmissive" is ultimately a matter of subjective perception. Accordingly, defendants argue that the patent does not give the public notice of the objective degree to which the transmission of radiant light must be reduced in order to fall within the scope of the claims. On the issue of indefiniteness, the burden falls to defendants to show a lack of specificity by clear and convincing evidence. *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008). Philips, for its part, maintains that defendants have failed to meet this heavy burden. Philips points out that the PTO raised and ultimately withdrew an

16

indefiniteness objection during patent prosecution, and that this court subsequently construed the term "non-transmissive" to admit of a softer boundary between the purely objective and the purely subjective after voluminous briefing, oral argument, and extensive analysis. Pl.'s Opp'n at 1, 3.

The court is unpersuaded by defendants' reliance on *Datamize*, which distinguished "a purely subjective phrase like 'aesthetically pleasing,'" from "words of degree such as 'substantially equal to,' 'about,' or 'substantial absence.'" 417 F.3d at 1350-1351 (citations omitted). *See also In re Swinehart*, 439 F.2d 210, 213-214 (C.C.P.A. 1971) (concluding that the disputed functional term "transparent to infrared rays" did not render the patent claim indefinite, even though "the degree of transparency varies" depending on environmental factors). The disputed term at issue here, "non-transmissive," is reasonably definite in that it excludes discs that are read in transmission or dual mode (as in the prior art). Moreover, the court agrees with Philips that "non-transmissive" must be read in the context of the entire Claim 1, which is a product claim (describing the structure of an optical disc) rather than a process claim. Thus, the fact that individual disc manufacturers' processes may vary in degree does not render the disputed term indefinite. *See Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 873 (Fed. Cir. 2010) ("Courts must generally take care to avoid reading process limitations into an apparatus claim . . . because the process by

17

which a product is made is irrelevant to the question of whether that product infringes a pure apparatus claim.") (citations omitted).   Because I cannot say that the disputed claim is fatally indefinite, defendants' motion for a judgment of invalidity will be denied.

## IV.  Prosecution Laches

Philips seeks summary judgment on defendants' contention that the claims of the '846 Patent are not enforceable under the doctrine of prosecution laches.  The validity of the defense of prosecution laches is an issue which "is to be decided as a matter of equity, subject to the discretion of a district court before which the issue is raised." *Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found.*, 422 F.3d 1378, 1385 (Fed. Cir. 2005).  The doctrine of prosecution laches "'may render a patent unenforceable when it has issued only after an unreasonable and unexplained delay in prosecution' that constitutes an egregious misuse of the statutory patent system under the totality of the circumstances." *Cancer Research Tech. Ltd. v. Barr Labs., Inc.*, 625 F.3d 724, 728 (Fed. Cir. 2010), citing *Symbol Techs., Inc. v. Lemelson Med.*, 277 F.3d 1361, 1366 (Fed. Cir. 2002).

The required showing of "an unreasonable and unexplained delay includes a finding of prejudice, as does any laches defense." *Cancer Research Tech. Ltd.*, 625 F.3d at 729.  "[T]o establish prejudice an accused infringer must show evidence of

intervening rights, i.e., that either the accused infringer or others invested in, worked on, or used the claimed technology during the period of delay." *Id*. The Federal Circuit has cautioned that the doctrine of prosecution laches "should be used sparingly lest statutory provisions be unjustifiably vitiated." *Symbol Techs.*, 422 F.3d at 1385.[18]

Philips formally began prosecution of the '846 Patent in the territorial United States by filing U.S. Patent Application No. 344,867 (the '867 Application) on March 26, 1973. After a series of rejections by the PTO Examiner and responses by Philips, the Examiner issued his final rejection in May of 1975. Philips then appealed to the Board of Patent Appeals and Interferences (BPAI). In September of 1976, the BPAI reversed the Examiner's rejections of the '867 Application. On January 28, 1977, the PTO issued a notice of allowance for the patent-in-suit.

Rather than accepting the grant of the '867 Application patent, Philips elected to file a continuation application (the '914 Application) on February 24, 1977. The

---

[18] Philips points out that the Federal Circuit has rendered a patent unenforceable under the doctrine of prosecution laches in only two cases. *In re Bogese*, 303 F.3d 1362 (Fed. Cir. 2002), held that an order by the PTO forfeiting an applicant's rights to a patent because of unreasonable delay was not arbitrary, "given that Bogese filed twelve continuation applications over an eight-year period and did not substantively advance prosecution of his application when required and given an opportunity to do so by the PTO." *Id.* at 1369. In *Symbol Techs.*, 422 F.3d at 1384-1386, the Federal Circuit held that the district court did not abuse its discretion in holding the patents at issue unenforceable on the ground of prosecution laches, where the patentee "engaged in 'culpable neglect' during the prosecution of the[] applications . . . ." *Id.* at 1386 (citations omitted).

Examiner issued a final rejection of the '914 Application on April 12, 1978.  Philips

filed a second continuation application (the '919 Application) on September 28, 1978.

The Examiner again rejected Philips' claims, and Philips filed a third continuation

application on May 2, 1980 (the '554 Application).  The Examiner ultimately rejected

the '554 Application on September 8, 1982.  On April 23, 1986, Philips filed a fourth

(and final) continuation application (the '550 Application).  In August of 1986, a new

PTO Examiner issued a final rejection of the '550 Application.  On January 27, 1987,

Philips appealed to the BPAI, which  affirmed in part the PTO's rejections.  On May

21, 1990, Philips appealed to the Federal Circuit, which reversed the rejections.  The

'846 Patent issued on November 26, 1991.

Philips argues that there is no genuine issue of material fact to support the

"improper delay" element of the prosecution laches defense.  Philips further argues that

the prejudice element is not met in any case, as there is no evidence that defendants –

companies that replicate CDs in bulk by using licensed technology – were investing in,

working on, or using optical disc technology during the patent prosecution period.

Defendants, for their part, argue that there are triable issues of fact as to whether

Philips abused patent continuation practice and caused prejudice to them and to others.

Specifically, defendants contend that an intent to delay can be inferred from Philips'

refusal to accept the grant of a patent in 1977.[19]  Defendants argue that the resulting delay was prejudicial because during the prosecution period, "the public, the optical disc replication industry in general, and Defendants, including Cinram, in particular, invested in, worked on, and used the technology that according to Philips the '846 patent covers, and thus developed intervening rights."  Defs.' Opp'n at 20.

Although defendants understandably emphasize the lengthy prosecution history of the '846 Patent, the mere passage of time from a patent application filing to the issuance of the patent is insufficient in and of itself to constitute improper delay.  *See Symbol Techs.*, 422 F.3d at 1385 ("[T]here are no strict time limitations for determining whether continued refiling of patent applications is a legitimate utilization of statutory provisions or an abuse of those provisions."); *Holmes Group, Inc. v. RPS Prods., Inc.*, 2010 WL 7867756, *9 (D. Mass. June 25, 2010) ("[I]n this case, defendant relies on little more than the timeline of events to establish that plaintiff abused the system.  That timeline – without additional evidence that plaintiff improperly delayed issuance of the [patent-in-suit] – is insufficient evidence to prove laches.").[20]  On reviewing the

---

[19] Philips maintains that it filed a further continuation application in 1977 because it did not want to be "stuck with the concessions it made in its attempts to overcome the ultimately reversed Examiner's rejections."  Pl.'s Mot. for Summ. J. at 2 (Dkt #404).

[20] Defendants contend that by filing four continuation applications over the span of fourteen years, Philips improperly delayed prosecution.  However, even longer and

prosecution history, as lengthy as it is, I am persuaded that at no point can it be fairly stated that Philips was being deliberately inactive in an effort to "submarine" the '846 Patent. If anything, Philips' dogged pursuit of the ultimately issued '846 Patent is more fairly described as hyperactivity than as deliberate indolence. Because I find that the first element of prosecution laches (unreasonable and unexplained delay) cannot be established, defendants' claims of prejudice need not be addressed. Consequently, I will grant Philips' motion for summary judgment on the issue of a prosecution laches bar.

## V.  Breach of Contract

On October 24, 2008, Philips moved for summary judgment on its breach of contract claim, arguing that because the parties had agreed to allow an independent expert to determine which patents were "essential" to the manufacture of the CDs, and because the expert found the '846 Patent to be "essential," the terms of the Licensing

---

more involved patent prosecutions have been held not to implicate prosecution laches. *See Cancer Research*, 625 F.3d at 728 (reversing the district court's finding of prosecution laches, despite the fact that the prosecution history included "eleven continuation applications, ten abandonments, and no substantive prosecution for nearly a decade"); *Studiengesellschaft Kohle mbH v. N. Petrochem. Co.*, 784 F.2d 351, 352 (Fed. Cir. 1986) (per curiam) (affirming the district court's finding of no laches or other inequitable delay, despite the fact that the prosecution period lasted over twenty years); *Regents of the Univ. of Cal. v. Monsanto Co.*, 2005 WL 3454107, *25-26 (N.D. Cal. Dec. 16, 2005) (finding the doctrine of prosecution laches inapplicable despite the fact that twenty-four years had passed between the application filing and the issuance of the patent).

Agreement were dispositive of defendants' royalty obligations.  The court denied the motion on grounds that it overstated the force of the expert's opinion.  *See Koninklijke Philips Elecs. N.V. v. Cinram Int'l Inc.*, 603 F. Supp. 2d 735 (S.D.N.Y. 2009).  Philips now renews the motion, arguing more narrowly that each of the defendants separately breached the Agreement by failing to pay the Standard Royalty Rates.

"To prevail on a breach of contract claim under New York law, a plaintiff must prove  (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."  *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-246 (2d Cir. 2000) (internal quotations omitted).

> Under New York law, the initial interpretation of a contract is a matter of law for the court to decide.  Where there are alternative, reasonable constructions of a contract, i.e., the contract is ambiguous, the issue should be submitted to the trier of fact.  However, if the contract is capable of only one reasonable interpretation, i.e., is unambiguous, [the court is] required to give effect to the contract as written.

*K. Bell & Assocs. v. Lloyds's Underwriters*, 97 F.3d 632, 637 (2d Cir. 1996) (citations omitted).

Philips entered into a CD Patent License Agreement with each of the defendants.[21]  The Agreement licenses a pool of patents that are "essential" for making

---

[21] Philips states that its Agreements with defendants are of two basic and similar types.  The Cinram, OEM, and EDC Agreements are identical, as are the ADS, AMI, and UMGML Agreements.

the licensed CDs.  In exchange for the license, the Agreement requires defendants to pay Philips royalties on each CD manufactured, sold, or otherwise disposed of.  The Agreement sets out a two-tiered royalty rate structure: a higher "Standard Rate" and a lower "Compliance Rate."   The following provision of the Agreement lists the requirements that must be met to qualify for the cheaper Compliance Rates.

> With respect to CD-Discs sold on or after July 1, 2002, provided that:
>
> a) Licensee is in full compliance with its obligations under this Agreement; and
>
> b) Licensee has submitted an audit statement by its external auditors, who shall be certified public auditors as specified in the Audit Guidelines attached hereto as Annex B2, confirming that the quarterly royalty statements as submitted by Licensee to Philips for the last twelve
> quarterly periods, are true, complete and accurate in every respect; and such statement must meet the requirements as specified in the Audit Guidelines;
>
> and subject to the provisions of Clause 6, Licensee may apply the . . . "Compliance Rates"
>
> In the event that Licensee fails to comply at any time with any of its obligations under this Agreement, the Standard Rates, as applicable, shall apply to Licensee's manufacture and sale of CD-Discs instead of the Compliance Rates, as applicable, with immediate effect from the first day of the reporting period to which the occurrence of non-compliance relates until such moment that Philips confirms in writing to Licensee that Licensee's noncompliance has been remedied in full.

Wieghaus Decl.- Ex. A ¶ 5.2.

From the inception, each defendant reported and made payments at the lower Compliance Rates, rather than at the Standard Rates.  Philips alleges that none of the defendants has been in full compliance with the terms of the Agreement and thus, no defendant was entitled to the discounted Compliance Rates.  Philips offers detailed evidence of non-compliance by each defendant, including instances of underpayment and underreporting of royalties, remitting royalties late, omitting information from royalty reporting forms (RRFs), failing to submit yearly audit reports, failing to submit equipment lists, and failing to keep accurate books and records.

Defendants, for their part, contend that Phillips' breach of contract argument is effectively waived by Philips' prior acceptance of royalty payments without protest or notice that payments should have been made at the Standard Rates.  This would be a winning argument were it not for the fact that each Agreement contains a non-waiver clause,[22] stating that any failure to enforce a contract provision when a breach occurs does not constitute a waiver of the licensees' obligations or Philips' right to enforce the

---

[22] The non-waiver clause states:

> [n]either the failure nor the delay of either party to enforce any provision of this Agreement shall constitute a waiver of such provision or of the right of either party to enforce each and every provision of this Agreement.

Wieghaus Decl.- Ex. A ¶ 13.5.

contract. New York courts recognize and enforce such non-waiver clauses. *See, e.g.*, *EchoStar Satellite, L.L.C. v. ESPN, Inc.*, 79 A.D.3d 614, 616, 619 (N.Y. App. Div. 2010); *U.S. Philips Corp. v. EMI Music, Inc.*, No. 05598/07 (N.Y. Sup. Ct. Nov. 16, 2007). While defendants are correct that non-waiver clauses are not a blanket permission for a licensor to delay enforcement solely for the purpose of amplifying its damages, defendants offer no evidence that this is true in Philips' case.

As a secondary defense, defendants make the argument that the alleged breaches are not material. This seems the case in many instances, but Philips is not claiming materiality for each incident of non-compliance; rather, the material breach being prosecuted is defendants' persistent failure to pay the Standard Rates. *Cf. Diamond D Enters. USA Inc. v. Steinsvaag*, 979 F.2d 14, 16-17 (2d Cir. 1992). In any event, Philips argues that materiality is irrelevant because the Agreements explicitly state that non-compliance need not be material for the Standard Rates to apply. I agree as a matter of law that paragraph 5.2 of the Agreement ("In the event that Licensee fails to comply at any time with any of its obligations under this Agreement, the Standard Rates, as applicable, shall apply.") is unambiguous. *Cf. Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 159 (2d Cir. 2000).

Because it is undisputed that none of the defendants paid the Standard Royalty

Rates, and Philips provides ample undisputed evidence to support a finding that none of the defendants fully complied with its Agreement with Philips, I will allow Philips' motion for summary judgment on the breach of contract claim as to the non-design-around discs.[23]

## VI. Penalty Clauses

The License Agreements provide for payment of the lower Compliance Rates so long as a licensee is in full compliance with the terms of the Agreement.  If a licensee is not in full compliance, it must pay the higher Standard Rates.  The Agreements also provide that all past due amounts will carry an interest rate of 2% per month (equal to an annual interest rate of 24%) or the highest rate allowable by law, whichever is lower.  Carbo Decl.- Ex. 3 ¶ 5.7.  Defendants seek a brevis declaration that the Standard Rates and the 2% monthly interest rate are unenforceable penalties and that they should be stricken from Philips' ad damnum.

Under New York law, "a liquidated damage provision is an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that

---

[23] In 2005, defendants notified Philips that they would no longer pay royalties under the respective Agreements because they had changed their manufacturing processes to work around any dependence on the '846 Patent.  Philips also seeks summary judgment that each defendant breached its Agreement by failing to pay royalties on these "design-around" discs.  Because this issue turns on whether the '846 Patent is found at trial to be valid and infringed, I will deny Philips' motion as to these discs.

would be sustained as a result of breach of the agreement." *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424 (N.Y. 1977).

> New York courts will construe a purported liquidated damages provision strictly, and will sustain such a provision only where the specified amount is a reasonable measure of the anticipated harm. Thus, the rule has evolved that where the damages flowing from a breach of a contract are easily ascertainable, or the damages fixed are plainly disproportionate to the contemplated injury, the stipulated sum will be treated as a penalty and disallowed.

*U.S. Fidelity & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 71 (2d Cir. 2004) (internal quotations and citations omitted).

Defendants contend that the Standard Rates and the 2% per month interest rate are "grossly disproportionate to, and far exceed any loss that Philips possibly could suffer from a breach (i.e., failure to pay the 'Compliance Rates' royalties)." Defs.' Mot. for Summ. J. on Penalty Clause at 7. *Cf. Zervakis v. Kyreakedes*, 684 N.Y.S.2d 291, 292 (N.Y. App. Div. 1999) (citations omitted) ("Under the circumstances of this case, the default provision of the stipulation, which required the defendants to pay more than twice the $40,000 agreed upon, despite the fact that they timely tendered payment of 90% of the amount due, is so disproportionate to the actual damages caused by the delay in payment that it constitutes an unenforceable penalty."). Defendants maintain that the only conceivable loss to Philips resulting from a breach of the Agreements is the underpayment of royalties. Defendants argue that the amount of that loss is easily

28

ascertainable, and would be the equivalent of royalties paid at the Compliance Rates, plus reasonable interest accruing between when royalties were paid and when they should have been paid.  Defendants argue that the true purpose of the Standard Rates and the 2% per month interest rate is not to make Philips whole, but rather, to compel compliance, gain a windfall, and discourage patent challenges.

In response, Philips points out that the New York Supreme Court has previously enforced the Standard Rates and the 2% monthly interest rate in another Philips case against a different CD manufacturer.  *See U.S. Philips Corp. v. EMI Music, Inc.*, No. 05598/07 (N.Y. Sup. Ct. Nov. 16, 2007) (ordering EMI to pay the Standard Rates plus interest because EMI failed to report CDs and pay timely royalties).  Philips also notes that the parties agreed in an arms-length transaction to the 2% per month interest rate. Philips contends that defendants' argument is based on an incorrect premise that the Standard Rates are liquidated damages subject to a penalty analysis.  Philips argues that there is no evidence that the parties intended the Standard Rates to estimate the injury resulting from a breach of the Agreements, as is the case with liquidated damages. Rather, Philips maintains that the Standard Rates were simply the former Compliance Rates carried over from Philips' prior license agreements, and the new Compliance Rates were meant to incentivize licensees to keep records and report royalties, and not to compensate Philips for losses from their failure to do so.

Whether or not this latter argument is correct, a liquidated damages penalty analysis would not apply to the Standard Rates under New York (and the better-reasoned federal) law.  As Philips points out, New York courts "have cautioned generally against interfering with parties' agreements," *JMD Holding Corp. v. Congress Fin. Corp.*, 4 N.Y.3d 373, 380-381 (N.Y. 2005), citing 3 E. Allan Farnsworth, Contracts § 12.18 (3d ed. 2004) ("[I]t has become increasingly difficult to justify the peculiar historical distinction between liquidated damages and penalties. Today the trend favors freedom of contract through the enforcement of stipulated damage provisions as long as they do not clearly disregard the principle of compensation").  *See also XCO Int'l Inc. v Pac. Scientific Co.*, 369 F.3d 998, 1002-1003 (7th Cir. 2004) (Posner, J.) ("The rule [against penalty clauses] hangs on, but is chastened by an emerging presumption against interpreting liquidated damages clauses as penalty clauses.").  Philips cites several post-*JMD Holding* cases that have found liquidated damages clauses to be proper and enforceable.  *See, e.g.*, *GFI Brokers, LLC v. Santana*, Nos. 06-Civ.-3988 (GEL), 06-Civ.-4611(GEL), 2009 WL 2482130, at *8-9 (S.D.N.Y. Aug. 13, 2009) (stating that "several additional factors support the enforceability of th[e] liquidated damages clause" at issue, including the parties' sophistication, the arms' length nature of the transaction, the fact that the parties were represented by counsel, and the fact that similar liquidated damages

clauses are prevalent in the industry).  The court agrees with Philips that defendants

have failed to meet their burden of showing that the Standard Rates and interest rate

provisions constitute unenforceable penalties, particularly when assessed among

sophisticated parties to a negotiated agreement.  *Cf. GFI Brokers*, 2009 WL 2482130,

at *8-9.  Therefore, I will deny defendants' motion for judgment on the issue of the

alleged unenforceability of the "penalty" clauses.

### VII.  Tortious Interference

Three of the named defendants (ADS, AMI, and OEM) have asserted

counterclaims against Philips for tortious interference with business relations.[24]  Philips

moves for summary judgment on each of the counterclaims, arguing that they are

unsupported by the evidence.[25]  Under New York law, a plaintiff alleging tortious

interference with business relations has the burden of proving the following elements:

(1) that plaintiff "had a business relationship with a third party; (2) the defendant knew

of that relationship and intentionally interfered with it; (3) the defendant acted solely

out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's

interference caused injury to the relationship."  *Kirch v. Liberty Media Corp.*, 449 F.3d

---

[24] Cinram also brought a tortious interference counterclaim.

[25] On this issue, the court views the facts alleged in the light most favorable to defendants as nonmoving parties.

388, 400 (2d Cir. 2006) (internal quotation and citation omitted). *See also Nadel v. Play-By-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000); *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 171-172 (2d Cir. 2004).

Philips contends that defendants have failed to satisfy the second element of the tort, that Philips knew of defendants' existing third-party relationships and attempted to interfere with them. In response, defendants note that Philips' argument is belied by its systematic campaign to illicitly identify and intimidate defendants' customers by improperly using discovery to obtain customer lists, and by then blitzing customers and potential customers with mass mailings threatening litigation. The court agrees with defendants that, on the basis of this evidence, a reasonable jury could conclude that the second element of the tort is met.

Philips further argues that defendants have failed to come forward with evidence that satisfies the third element of tortious interference – that Philips "acted solely out of malice, or used dishonest, unfair, or improper means." *Kirch*, 449 F.3d at 400. In response, defendants point to the fact that Philips conspicuously eliminated them from the online list of approved licensed replicators. Philips maintains that it removed defendants from the list of approved licensees to coerce them into doing what the Agreements required them to do – to pay royalties and to refrain from infringing activities. *Cf. Anderson News, L.L.C. v. Am. Media, Inc.*, 732 F. Supp. 2d 389, 404

(S.D.N.Y. 2010) ("[C]onduct undertaken to economically benefit defendants and not solely based on malice toward the plaintiff does not amount to tortious interference with business relations."), *vacated on other grounds*, 680 F.3d 162 (2d Cir. 2012). Defendants counter that Philips' hiring of private investigators to sift through trash, and the abuse of the discovery process to obtain customer lists, is ample evidence that Philips acted dishonestly and with improper means.  In this regard, during the course of discovery Philips inadvertently turned over a file note entered by one of its attorneys bragging that Philips had exploited the customer lists turned over by defendants during discovery "for targeted mailings at customers to advise of noncompliance of the litigated replicator. . . . [and] where possible [] turn[ed] the customer lists over to compliant licensees to increase their business."[26]  Order on Defs' Motion for a Ruling that a "Summary" Document Produced by Philips is not Protected Work Product (Dkt #396) at 2.

To establish liability for tortious interference with a prospective business relationship, "[a]s a general rule, unless the 'defendant engaged in conduct for the sole purpose of inflicting intentional harm on plaintiffs,' the defendant's conduct must

_____

[26] The note was the subject of two "permission to use" motions, the second of which the court granted, finding that although the document was work product, defendants "would not be able to obtain the substantial equivalent of the material elsewhere."  Order on Defs' Motion for a Ruling that a "Summary" Document Produced by Philips is not Protected Work Product (Dkt #396) at 5.

amount to a crime or an independent tort." *Medtech Prods. v. Ranir, LLC*, 596 F. Supp. 2d 778, 815 (S.D.N.Y. 2008).  While the issue is by no means open and shut, I am persuaded that a reasonable jury could find that Philips, by using customer lists produced in response to discovery requests for the illegitimate purpose of diverting business away from defendants, committed the independent tort of abuse of process. *See Bd. of Ed. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n, Inc., Local 1889 AFT AFL-CIO*, 38 N.Y.2d 397, 403 (1975) ("[T]hree essential elements of the tort of abuse of process can be distilled from the preceding history and case law.  First, there must be regularly issued process, civil or criminal, compelling the performance or forebearance of some prescribed act.  Next, the person activating the process must be moved by a purpose to do harm without that which has been traditionally described as economic or social excuse or justification.  Lastly, defendant must be seeking some collateral advantage or corresponding detriment to the plaintiff which is outside the legitimate ends of the process.")

As to the fourth element (injury), defendants contend that they "were required to implement substantial and costly strategies for defending against Philips' threats and wrongful allegations in order to protect their businesses and preserve their business relationships."  Defs.' Opp'n to Philip's Summ. J. Mot. on Defs' Countercls. for Tortious Interference with Business Relationship at 9 (December 22, 2011).

Specifically, OEM alleges that it had to prepare "talking points" so that its sales representatives could respond to inquiries from customers and potential customers regarding Philips' mailings and OEM's removal from Philips' online list of licensed replicators.   OEM also alleges that Philips' actions adversely affected its communications with two potential customers, Synergetics and LifeWay.  These facts, which the court accepts as true, nonetheless fail to rise to the level of injury that is required for a claim of tortious interference.   Defendants do not refute Philips' argument that they have failed to identify any lost customers or any severed third-party business relationships attributable to Philips' wrongful conduct.  *See RFP, LLC v. SCVNGR, Inc.*, 788 F.  Supp.  2d 191, 198 (S.D.N.Y. 2011) ("Interference that does not rise to the level of a breach of agreement or severance of the relationship does not amount to an injury sufficient to make a tortious interference claim.").  *Cf. Nadel*, 208 F.3d at 382 (mere suspicions are inadequate to support a claim for tortious interference with business relations); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 115 (2d Cir. 2010) (rejecting claims of tortious interference with business relations where the "allegations are too conclusory, vague, and lacking in a factual basis").  Because defendants have failed to satisfy the damages element of a claim of tortious interference with business relations, I will allow Philips' motion for summary judgment on the tortious interference counterclaims.

## VIII.  Claims Asserted by Koninklijke Philips Electronics N.V.

Defendants seek summary judgment dismissing all counts asserted in the Second Amended Complaint by plaintiff Koninklijke Philips Electronics N.V. (KPENV), for lack of any redressable injury.  KPENV and co-plaintiff U.S. Philips Corporation both assert a claim for infringement of the '846 Patent.  U.S. Philips is the assignee of the '846 Patent.  KPENV, acting as the agent of U.S. Philips, entered into the Agreements with defendants granting licenses to use the '846 Patent.          Defendants argue that KPENV lacks standing to assert a claim for infringement of the '846 Patent.

> The party bringing the action bears the burden of establishing that it has standing.  It is well-settled that only a patent owner or an exclusive licensee can have constitutional standing to bring an infringement suit; a non-exclusive licensee does not.  To be an exclusive licensee for standing purposes, a party must have received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory as well.

*Spine Solutions*, 620 F.3d at 1317.  Defendants contend that KPENV has no ownership interest in the '846 Patent and is not an exclusive licensee under the Patent.

Plaintiffs,[27] for their part, contend that KPENV has standing to assert a claim of

---

[27] Generally, the court has used the term "Philips" to refer collectively to co-plaintiffs U.S. Philips and KPENV.  Here, for the sake of clarity, the court will use the term "plaintiffs" to refer collectively to U.S. Philips and KPENV.

infringement of the '846 Patent because U.S. Philips granted KPENV exclusive licensee status in 2002, and KPENV remained the exclusive licensee until the Patent's expiration in 2008.  Plaintiffs note that beginning on July 1, 2002, all licenses to the '846 Patent were granted by KPENV, in its name, by written Agreements requiring royalties to be paid to KPENV.

The fact that KPENV became the sole licensor of the '846 Patent (and that U.S. Philips stopped licensing the '846 Patent) after 2002 demonstrates conduct consistent with an exclusive licensee-licensor relationship.  This case is therefore distinguishable from *Spine Solutions*, where evidence of an exclusive licensee status was lacking.  *Cf. Spine Solutions*, 620 F.3d at 1318 (holding that evidence showing that the patent assignee owned and enforced the patent, and that the assignee's sister corporation was the only entity that made and sold products practicing the patent, was insufficient to establish the sister corporation as an exclusive licensee with standing to bring an infringement suit).

Even granting KPENV standing to enforce the '846 Patent, defendants contend that KPENV acted solely as an agent for U.S. Philips, and that there is no evidence that KPENV suffered any injury as a result of any alleged breach of the License Agreements. The court previously rejected defendants' challenge to KPENV's standing to assert a claim for breach of contract.  *See Koninklijke Philips*, 603 F. Supp. 2d at 740 ("Relying

ultimately on common sense, the court finds that all necessary plaintiffs are parties to the lawsuit, namely U.S. Philips as the owner of the '846 patent, and [KPENV] as the Agreement's signatory.  The court therefore rejects Cinram's standing argument . . . .").  The court sees no reason to revisit that decision, particularly where plaintiffs have provided evidence that the licensing Agreements at issue require royalty payments to be made directly to KPENV.  Defendants' motion for summary judgment dismissing all counts asserted by KPENV will be denied.

### IX.  Claims Against UMG, UMGML, and EDC

Finally, defendants move for summary judgment dismissing all claims against Universal Music Group, Inc. (UMG) with prejudice, and limiting Philips' claims against Universal Music Group Manufacturing & Logistics, Inc. (UMGML), and Entertainment Distribution Company (USA) LLC, and Entertainment Distribution Company LLC (collectively, EDC).

The court previously denied UMG's motion to dismiss Philips' patent infringement claim against UMG, finding that the allegations made in the First Amended Complaint were sufficient to state a plausible entitlement to relief.  *See* March 5, 2010 Mem. & Order at 3 (Case No. 7:08-cv-04070, Dkt #101) ("The allegations state that UMGI was directly involved in the inducement of EDC's breach, or, in the alternative, is liable as an infringer. Although it may ultimately be demonstrated that UMGI is a parent company

insulated from liability for UMGML's actions, that determination must be addressed by the court at summary judgment or by the finder of fact at trial.").

Having reached the summary judgment phase, defendants contend that Philips has produced no evidence of UMG's supposed infringement, or of UMG's alleged inducement of EDC to breach an agreement. Defendants maintain that UMG is simply a holding company that has never made, purchased, or sold CD Audio Discs; that it has never had a contract with Philips; and that it never induced EDC to breach any contract. In response, Philips contends that "deposition testimony and UMGML documents *suggest that it may be* UMG's role to oversee UMGML's payment and compliance with Philips' CD-Disc Patent License Agreement." Pl.'s Opp'n to Summ. J. Mot. Dismissing All Claims Against UMG and Limiting Philips' Claims Against UMGML and EDC at 21 (emphasis added). This "suggestion" does not rise to the level of evidence sufficient to create a genuine or even plausible dispute of material fact as to whether Philips has a valid claim against UMG for patent infringement. The court will therefore allow defendants' motion for summary judgment dismissing all claims against UMG.

Defendants further argue that Philips' breach of contract claims against UMGML and EDC should be dismissed with prejudice. On July 1, 2002, Philips and UMGML entered into a CD Patent License Agreement. Defendants maintain that because UMGML did not check the box on the License Agreement indicating that the Agreement

would apply to CD Audio Discs and the '846 Patent, Philips has no express agreement covering the CD Audio Discs with either UMGML or EDC.[28]

Philips, for its part, argues that UMGML and EDC performed under the Agreement and acted as if the Agreement covered CD Audio Discs.  For example, over 99 percent of the CDs that UMGML reported to Philips (between July of 2002 and May of 2005) were CD Audio Discs.  UMGML paid royalties (at the Compliance Rates[29]) to Philips on these Discs, frequently stating that it had sold "Licensed Products," including CD Audio Discs, to others.  *See Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of NJ., Inc.*, 448 F.3d 573, 582 (2d Cir. 2006)  ("Under New York law, the conduct of the parties may lead to the inference of a binding agreement . . . . The terms of an implied-in-fact contract turn on the conduct of the parties.");  *Dodge St., LLC v. Livecchi*, 32 Fed. Appx. 607, 611 (2d Cir. 2002) ("Under New York law, even if a party subjectively does not intend to be legally bound, if his actions,

---

[28] EDC purchased UMGML's replicating business in May of 2005.  At that point, EDC "effectively took over all of the terms and conditions of UMGML's [License] Agreement with Philips," and operated under that Agreement at least until it signed its own License Agreement with Philips in January of 2007.  *See* Pl.'s Opp'n to Summ. J. Mot. Dismissing All Claims Against UMG and Limiting Philips' Claims Against UMGML and EDC  at 10.

[29] Philips points out that there would have been no reason for UMGML or EDC to have paid the Compliance Rates on CD Audio Discs if, as they argue, they believed that they were not subject to the Licensing Agreement.

gauged by an objective standard, support the conclusion that he accepted the agreement, he will be legally bound to honor the contract."). Here, the court finds that the undisputed material evidence demonstrates that UMGML/EDC were bound by an implied contract to pay royalties to Philips as of the date the Agreement was entered (July 1, 2002). The court will therefore deny defendants' motion seeking dismissal of Philips' breach of contract claims against UMGML and EDC.

As a parting gesture, defendants seek partial summary judgment dismissing Philips' claims against UMGML and EDC for patent infringement damages for the period from June of 2005 through November 26, 2008. Defendants contend that Phillips' damages claim is limited to the time period from April of 2006 (when EDC stopped paying royalties) until the expiration date of the '846 Patent in 2008. Defendants also maintain that EDC is immune from a patent infringement claim for the period between June of 2005 through March of 2006 to the extent that it paid royalties under the implied license. Defendants argue that UMGML is likewise immune from an infringement claim during the same time period because it was a non-replicator customer of EDC and, as a result, is immunized from liability by the doctrine of patent exhaustion.[30] Although Philips contends that a dispute of fact exists as to whether

---

[30] Defendants assert (without serious contradiction by Philips) that when UMGML sold its operations to EDC, it ceased being a manufacturer of CDs, and that it purchased CD Audio Discs from EDC from June of 2005 through March of 2006.

UMGML purchased CDs from EDC acting is a capacity as a customer or as a replicator, Philips has offered no evidence worthy of jury consideration on the issue. Consequently, I will allow defendants' motion for summary judgment dismissing Philips's infringement damages claims against UMGML and EDC for the period between June of 2005 through March of 2006.

ORDER

For the foregoing reasons, defendants' motion for summary judgment on Philips' patent infringement claim is <u>DENIED</u>.  Defendants' motion for summary judgment on Philips' claim of willful infringement is <u>DENIED</u>.  Defendants' motion for summary judgment that the asserted claims are invalid as indefinite is <u>DENIED</u>.  Philips' motion for summary judgment that the '846 Patent is not unenforceable  under the doctrine of prosecution laches is <u>ALLOWED</u>.  Philips' motion for summary judgment on its breach of contract claim is <u>ALLOWED</u> as to the non-design-around discs only.  Defendants' motion for a summary declaration that the "penalty" clauses of the License Agreements are unenforceable is <u>DENIED</u>.  Philips' motion for summary judgment on defendants' counterclaims for tortious interference with business relations is <u>ALLOWED</u>. Defendants' motion for summary judgment dismissing all counts asserted by KPENV is <u>DENIED</u>.  Defendants' motion for summary judgment dismissing all claims against UMG is <u>ALLOWED</u>.  Defendants' motion for summary judgment dismissing Philips'

42

breach of contract claims against UMGML and EDC is <u>DENIED</u>.  Defendants' motion

for partial summary judgment dismissing in part Philips' claims against UMGML and

EDC for patent infringement is <u>ALLOWED</u>.  The Clerk will issue the appropriate Pretrial

Order to the remaining parties.  Philips will enter an election as to its damages claims on

or before October 5, 2012.

                        SO ORDERED.

                        /s/ Richard G. Stearns

                        _____

                        UNITED STATES DISTRICT JUDGE